IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DEMETRIUS H. NICHOLS, deceased by and through DIANE JONES his sister and next best friend and Administrator of the Estate of DEMETRIUS H. NICHOLS, | )<br>)<br>)<br>)<br>) |
| Plaintiff, | ) Case No. 24-cv-796-SMY<br>) |
| vs. | )<br>) |
| WEXFORD HEALTH SOURCES, INC., DR. MOHAMMED Z. SIDDIQUI, N.P. ALI DEARMOND, and DR. STEPHEN RITZ, | )<br>)<br>)<br>) |
| Defendants. | )<br>) |

# MEMORANDUM AND ORDER

**YANDLE, District Judge:**

On January 28, 2021, Demetrius Nichols died while incarcerated at Menard Correctional Center. Plaintiff Diane Jones, Administrator of the Estate of Demetrius Nichols, filed this action against Wexford Health Sources, Inc. ("Wexford"), Dr. Mohammed Siddique, Ali Dearmond, NP, Dr. Stephen Ritz, Dr. Hector Garcia, Dr. Kurt Osmundson, and Tammie Rable, asserting violations of 42 U.S.C § 1983 and state law claims for wrongful death and survival. Plaintiff's claims against Defendants Garcia, Osmundson, and Rable have been resolved (*see* Docs. 111, 121).

Plaintiff states the following causes of action in the First Amended Complaint:

Count I:   Eighth Amendment deliberate indifference claim under 42 U.S.C. § 1983 against Defendants Siddique, Ritz, and Dearmond in their individual capacities and as Wexford employees/agents;

Count II:   Wrongful death under the Illinois Wrongful Death Act against Wexford;

Count III:   An Illinois Survival Action claim against Wexford; and

Count IV:   A *Monell* claim under 42 U.S.C. § 1983 against Wexford.[1]

This matter is now before the Court for consideration of the motion for summary judgment filed by the remaining Defendants (Doc. 125) and the partial motion for summary judgment filed by Plaintiff (Doc. 130). The motions are fully briefed. For the following reasons, Defendants' Motion is **GRANTED in part** and **DENIED in part**; Plaintiff's Motion is **DENIED**.

### Factual Background

Construed in the light most favorable to the nonmoving party, the evidence and reasonable inferences establish the following facts relevant to the pending summary judgment motions:

### *Nasal Polyps and Prednisone*

Nasal polyps are caused by severe inflammation of the lining of the nose and sinuses that result in mucus-filled polyps throughout the nasal system (Doc. 139-2, pp. 85-86; Doc. 139-3, pp. 22-23). Nasal polyps interfere with the ability to draw air through the nasal passages and with the normal drainage and ventilation of the sinuses, causing nasal pressure and pain (Doc. 139-3, pp. 24-27; Doc. 139-4, p. 70). The mucus produced by nasal polyps puts pressure on the sinuses and causes postnasal drip down the back of the throat (Doc. 139-3, pp. 26-27). Individuals with nasal polyps tend to be more susceptible to bacterial infections (Doc. 139-4, p. 84).

An obstruction in the sinuses from nasal polyps when you suffer from asthma can be very serious (Doc. 141-2, p. 70). Asthma can also cause a thick mucus in addition to constricting airways. *Id.* at p. 91. The removal of obstructive nasal polyps is an important part of managing asthma as patients who have their nasal polyps removed tend to have fewer asthma attacks (Doc. 139-2, pp. 85-86).

---

[1] Plaintiff concedes that the alleged deliberate indifference by the individual defendants cannot support an Eighth Amendment claim traceable to Wexford and voluntarily dismisses her *Monell* claim. *See* Doc. 150, at p. 23. Accordingly, Count IV is **DISMISSED with prejudice**.

Corticosteroids like Prednisone have short-term and long-term side effects, including immunosuppression, increased risk for other diseases, recurrent infection, suppression of the adrenal glands, and immune separation (Doc. 126-14, p. 145; Doc. 126-8, p. 69; Doc. 126-10, p. 37; Doc. 126-15, pp. 53-54). Oral steroids may help by temporarily shrinking nasal polyps. However, they are not appropriate for recurring daily use and should be used sparingly. (Doc. 126-8, pp. 62-63, 68-69). According to Wexford's Medical Director at Menard, Dr. Siddiqui, there are dangers to taking Prednisone daily for extended periods of time and it "should be taken as few times, and as little as possible" (Doc. 126-14, pp. 154-155).

### *Nichols' Medical History*

In 2013, Wexford approved a referral for an Ear, Nose, and Throat ("ENT") specialist to evaluate and treat Nichols' obstructive nasal polyps while he was an inmate at Dixon Correctional Center. Nichols subsequently underwent a polypectomy, a surgical procedure to remove the nasal polyps and reconstruct his sinus cavity (Doc. 139-5, p. 4).

Nichols subsequently transferred to Illinois River Correctional Center ("Illinois River"). In a seven-month period at Illinois River, Nichols was prescribed tapered doses of Prednisone on six occasions to address his asthma and obstructive nasal polyps: June 16, 2019 through August 9, 2019, 5 mg every day; September 3, 2019, 40 mg. for 7 days; October 8, 2019, 40 mg. for 7 days; November 19, 2019, 10 mg daily for 3 days increased to 40 mg for 7 days, reduced to 20 mg. for 3 days; January 7, 2020, 40mg for 7 days, reduced to 20 mg. for 3 days and 10 mg for 3 days; and February 11, 2020, 40 mg for 7 days, reduced to 20 mg. for 7 days (Doc. 140-7, pp. 668, 672, 680, 682, 694, 688, 698, 700).

On February 11, 2020, Dr. Kurt Osmundson observed swelling nasal polyps in both of Nichols' nostrils despite repeated doses of Prednisone; he requested an outside ENT evaluation

(Doc. 149-1, p. 493, 587; Doc. 149-2, pp. 8-12). That same day, Dr. Osmundson submitted a request to Wexford for a referral for Nichols to be examined by an ENT specialist for "obstructed nasal polyps" per Wexford's "collegial review" protocol (Doc. 139-2, p. 291; Doc. 140-6, p. 587). On February 18, 2020, Wexford Utilization Management (UM) Director Dr. Garcia approved the request for the ENT referral (Doc. 141-1, pp. 32-33; Doc. 140-6, p. 585). The Wexford approval for the ENT referral specifically stated that Nichols had a polypectomy in 2013 and was "treated multiple times with Prednisone and antibiotics without relief" (Doc. 139-2, pp. 291-292; Doc. 139-3, p. 38; Doc. 140-6, p. 585). Dr. Stephen Ritz testified the reason the Wexford approval stated Nichols was "treated multiple times with Prednisone and antibiotics without relief" was to explain why the service was medically necessary from a clinical standpoint. There would be no need for an outside referral if Prednisone was effective (Doc. 141-1, pp. 52-53).

On February 27, 2020, Nichols was transferred from Illinois River to Menard Correctional Center (Doc. 140-5, pp. 496-497; Doc. 141-1, p. 33). Wexford providers at Menard prescribed Prednisone to Nichols ten more times from March 2020 until his death in January 2021, despite the documentation in his medical records that Prednisone provided no relief (Doc. 126-5, pp. 765-775).

The protocol at Menard for an inmate to see a doctor or nurse practitioner ("NP") is for the inmate to submit a written request or kite that is screened by a registered nurse ("RN") who then schedules the inmate for an assessment. Following the assessment, the nurse decides if the inmate should be scheduled for an evaluation by a doctor or NP (Doc. 141-3, pp. 25, 30-31).

Due to the COVID-19 global pandemic and Governor Pritzker's March 13, 2020 Order, on March 20, 2020, the Illinois Department of Corrections ("IDOC") was placed on an Administrative

Quarantine and all non-emergent medical furloughs (offsite appointments) were prohibited until June 15, 2020 (Doc. 126-6, p. 88-89; 102-107; 312-313; 632; Doc. 126-14, pp. 158-160).

Nichols filed a grievance on March 18, 2020 about the ENT referral, stating he was in "constant pain from nasal polyps," and having difficulty breathing (Doc. 139-2, pp. 286-287; Doc. 139-3, pp. 50-51; Doc. 141-5). On March 20, 2020, Nichols was seen by RN Burns for his nasal polyps. (Doc. 141-2, pp. 42-43). Burns noted Nichols' nasal cavity was not visible due to drainage and referred him the to the medical provider call line ("MDCL"). *Id*.

On March 23, 2020, Southern Illinois Hospital ("SIH") ENT received Nichols' referral and PA Jill Absher triaged his case as "first avail ok," meaning his appointment was non-emergent and he would be scheduled for the next available new patient appointment (Doc. 126-7, p. 685; Doc. 126-8, pp. 35-36). SIH attempted to call Menard multiple times to schedule the appointment in March and April 2020, with no response. The referral expired (Doc. 126-8, pp. 33-35).

On March 24, 2020, Nichols was seen by NP Michael Moldenhauer who noted the large nasal polyps affected Nichols' "nasal resonance voice-deficit" (Doc. 141-2, pp. 43-44; Doc. 140-6, p. 503). Moldenhauer consulted with Dr. Siddiqui and prescribed Nichols a tapered dose of Prednisone for 4 weeks (40 mg daily for 7 days, 20 mg daily for 7 days, 10 mg daily for 2 weeks, and then stop) (Doc. 141-2, pp. 43-44, 148-149; Doc. 139-3, p. 45; Doc. 140-6, pp. 506-508; Doc. 141-6, p. 765). On March 25, 2020, Wexford again authorized the outpatient ENT evaluation for Nichols which stated that Nichols had a previous polypectomy in 2013 and been "treated multiple times with Prednisone without relief." (Doc. 141-2, pp. 48-49; Doc. 140-6, p. 586).

Nichols was admitted to the infirmary on April 24, 2020 for a 23-hour observation because of shortness of breath, coughing, and wheezing. (Doc. 141-2, pp. 53-54; Doc. 140-6, pp. 506-507). Based on his age and weight, Nichols had an expected peak flow of 575. (Doc. 139-2, pp. 223-

224).  On April 24, 2020, his peak flow measurements were 250-200-250 (Doc. 126-5, pp. 506-507).  Moldenhauer prescribed Nichols another 4-week tapered dose of Prednisone (40mg daily for 7 days, 20 mg daily for 7 days, 10 mg daily for 2 weeks, and then stop). (Doc. 141-2, p. 149; Doc. 141-6, p. 766).

Due to the Covid-19 pandemic, Menard was on a state mandated lockdown and was unable to schedule outside medical furloughs from May to June 2020. (Doc. 139-3, pp. 64-65).  On June 9, 2020, NP Mary Jo Zimmer admitted Nichols to the Menard Health Care Unit ("HCU") with complaints of shortness of breath and severe nasal polyps. (Doc. 141-2, pp. 62-63; Doc. 140-6, pp. 514-519).  Nichols' peak flow measurements were 175-150-200 (Doc. 126-5, pp. 516-517).  Moldenhauer prescribed Nichols another tapered 2-week dose of Prednisone (40mg daily for 3 days, 30 mg daily for 3 days, 20 mg daily for a week). (Doc. 141-2, pp. 149-150; Doc. 141-6, p. 768).  Zimmer spoke to medical furlough clerk Elizabeth Young and told her Nichols' outside ENT evaluation "need[ed] to be a priority" (Doc. 139-3, p. 65; Doc. 139-2, p. 289; Doc. 140-6, p. 514).  Offsite scheduling at Menard was handled by the site schedulers (Doc. 126-14, pp. 19-20, 35, 86-87; Doc. 126-15, pp. 14, 58; Doc. 126-13, pp. 19-20).

On July 27, 2020, Nichols sent a sick call note that he needed to be seen by a doctor as soon as possible for his nasal polyps (Doc. 140-8, p. 808).  On July 29, 2020, he was seen by RN Lakita Burns and assessed for constant pain caused by the nasal polyps in both nostrils, reporting his pain level was 10 out of 10 (Doc. 141-2, p. 87; Doc. 140-6, p. 525).  Moldenhauer prescribed Nichols another 20-day tapered dose of Prednisone for the nasal polyps on July 30, 2020 (20mg daily for 10 days, 10 mg daily for 10 days, and then stop) (Doc. 141-2, pp. 88-89, p. 150; Doc. 141-6, p. 769).

Nichols filled out another sick call request on August 17, 2020 stating that his nasal polyps were swollen and causing difficulty in breathing (Doc. 141-3, pp. 46-47). On August 18, 2020, RN Melissa Ogle noted that Nichols continued to suffer from pain due to nasal polyps and that she was unable to examine inside of his nose at cell front because of the size of the polyp. Nichols rated the aching pain from the polyps as 10 out of 10 for a duration of weeks (Doc. 141-2, p. 89; Doc, 141-3, pp. 48-49; Doc. 140-6, pp. 530-531).

On August 22, 2020, Nichols filled out another sick call request saying that the nasal polyps were swelling again and making it difficult for him to breathe (Doc. 141-3, pp. 53-54). On August 24, 2020, RN Shelby Dunn's progress note stated the nasal polyps were visible and Nichols complained of constant and stabbing pain, rating it a 10 out of 10 (Doc. 141-3, pp. 50-51; Doc. 141-2, p. 90; Doc. 140-6, p. 531). Dunn noted his eyes were visibly watering due to the pain. *Id*. On August 31, 2020, NP Ali Dearmond prescribed Nichols another 20-day tapered dose of Prednisone (20mg daily for 10 days, 10 mg daily for 10 days, and then stop). (Doc. 141-2, p. 150; Doc, 141-3, p. 56; Doc. 141-6, p. 769).

On September 2, 2020, Dearmond noted that Nichols complained he could not breathe because of the large polyps in his nose (Doc. 141-3, pp. 58-60; Doc. 141-2, pp. 92-95; Doc. 140-6, p. 533). Dearmond prescribed Nichols a 125 IM shot of Solumedrol, 1 spray in each nostril daily of Nasacort spray, and continued him on the Prednisone that was previously prescribed on August 31, 2020, allowing him to keep it on his person ("KOP"). *Id*.; Doc. 141-6, p. 769. Solumedrol is a corticosteroid that acts as a more potent, immediate, and short-term suppression than oral Prednisone (Doc. 139-3, p. 48). On September 5, 2020, Nichols complained to RN Lee Gregson of sinus polyps, drainage, and a cough (Doc. 140-6, p. 534).

The ENT referral approved by Wexford on February 20, 2020, did not take place until September 16, 2020 (Doc. 141-2, pp. 75-77; Doc. 139-4, p. 12). On September 16, 2020, Nichols was evaluated by Absher of SIH to address the obstructive nasal polyps. (Doc. 139-4, pp. 6, 11-12). Absher documented the nasal polyps were a "total obstruction" within Nichols' sinus cavity. (Doc. 139-4, pp. 16-17, 69). Absher ordered a CT scan for the sinuses and follow up with ENT Dr. Mann to plan for another polypectomy to surgically remove the obstructive nasal polyps. (Doc. 139-4, pp. 17-21; Doc. 141-7, p. 662). Absher did not order the CT scan to be completed urgently because she did not observe an acute problem or infection. (Doc. 139-4, pp. 53-54, 60). She did not have concerns that Nichols was immunosuppressed or immune compromised when she assessed Nichols on September 16, 2020, as he did not exhibit any symptoms of lung, urinary, or other infections. *Id.* at p. 60. Absher recommended that Nichols increase his use of Nasacort, previously prescribed on September 2, 2020, to two sprays twice a day to prep for the CT scan. She also recommended a Prednisone taper to potentially temporarily reduce swelling for the CT scan. (Doc. 139-4, pp. 18-19, p. 62; Doc. 141-7, p. 591).

On September 21, 2020, Moldenhauer prescribed a 30-day prescription of Prednisone for Nichols (10 mg daily for one month). (Doc. 141-2, p. 152; Doc. 141-6, p. 771). Dr. Siddiqui modified Nichols' Prednisone prescription on September 24, 2020 to a tapered dosage over the next month. (7.5 mg daily for one week, 5mg daily for 2 weeks, 2.5 mg daily for one week) (Doc. 141-2, pp. 151-152). Dr. Siddiqui had access to the previous prescription orders for Nichols and knew that Nichols had been prescribed Prednisone for extended daily use since March. (Doc. 141-2, pp. 154-155). Dr. Ritz and Dr. Siddiqui had another "collegial review" and approved the sinus CT scan requested by Absher on September 24, 2020 (Doc. 141-1, p. 41). The Wexford "Notice

of Approval" for the CT scan specifically stated that Nichols was "treated multiple times with Prednisone and antibiotics without relief." (Doc. 140-7, p. 601; Doc. 141-1, pp. 41-42).

On October 15, 2020, Nichols reported that the steroids (Prednisone) "work[ed] good" and his condition had improved. (Doc. 126-5, p. 546). However, on November 6, 2020, he reported to RN Sharon Rogers that the nasal polyps were swollen and causing breathing trouble and requested to see a medical provider. (Doc. 141-3, p. 80; Doc. 140-6, p. 548). On November 10, 2020, Moldenhauer prescribed him 5 mg of Prednisone daily for two weeks. (Doc. 141-2, p. 152; Doc. 141-6, p. 772). On November 13, 2020, Nichols was admitted to the infirmary on 23-hour watch for shortness of breath for the third time complaining that the "nasal polyps made his breathing worse" and received a shot of 125 IM Solumedrol, a corticosteroid injection and nebulizer treatment. (Doc. 141-3, pp. 82-84; Doc. 139-3, p. 50; Doc. 140-6, pp. 549-553; Doc. 141-6, p. 772).

Nichols received a CT scan at SIH Herrin Hospital on December 1, 2020. Dr. Michael E. Thomas stated the findings were "near complete opacification of right maxillary sinus," meaning that the obstruction was severe and the sinus cavities were completely blocked. (Doc. 139-4, pp. 23-25). Dr. Siddiqui reviewed the CT scan report and incorrectly documented that the results were negative and nasal polyps were not seen. He did not request an ENT follow up appointment as requested by Absher. (Doc. 141-2, pp. 109-110; Doc. 139-4, pp. 29-30; Doc. 140-6, p. 558). On December 4, 2020, RN Ogle reported that Nichols' swollen nasal polyps were causing him difficulty in breathing, rating the pain an 8 out of 10. (Doc. 141-2, pp. 114-115; Doc. 141-3, pp. 91-92; Doc. 140-6, p. 560).

On December 6, 2020, Nichols was admitted to the HCU for shortness of breath by RN Engelhardt, who noted a large nasal polyp visibly protruding from his left nostril and requested he

be seen by a provider. (Doc. 140-6, pp. 564-565). On December 7, 2020, Dr. Siddiqui did not see Nichols but conducted a "jacket review" of his medical file and requested a follow up appointment with the ENT "ASAP." (Doc. 141-2, pp. 117-120; Doc. 140-6, p. 562). According to Dr. Siddiqui, he wanted the appointment "expedited" because of the obstructive nasal polyp was "visibly hanging from the nose." (Doc. 141-2, pp. 121-122). The expedited follow up appointment never occurred (Doc. 141-2, pp. 164-166; Doc. 139-5, pp. 9, 24-25). As the physician that ordered the follow-up referral, it was Dr. Siddiqui's responsibility to monitor the referral and ensure it took place. (Doc. 141-3, p. 23; Doc. 141-4, p. 14).

Dearmond noted Nichols had trouble breathing through his nose again and had a large nasal polyp blocking nasal passage on December 8, 2020 (Doc. 141-3, pp. 97-99; Doc. 140-6, p. 566). She prescribed Nichols another 125 IM shot of Solumedrol, a corticosteroid injection, and another 20-day prescription of Prednisone (20 mg daily for ten days, 10mg daily for ten days, and then stop). *Id.*; Doc. 141-6, p. 773.

On December 10, 2020, Dr. Siddiqui and Dr. Ritz had another "collegial review" and Wexford approved the ENT follow up. The "Notice of Approval" for the ENT follow up appointment was sent to Menard on December 14, 2020. (Doc. 141-2, pp. 123-124; Doc. 140-7, p. 606). The December 14, 2020, Wexford "Notice of Approval" for the ENT follow up appointment specifically stated that Nichols had a prior polypectomy in 2013, and the nasal polyps were "treated multiple times with Prednisone and antibiotics without relief" (Doc. 140-7, p. 606).

On December 21, 2020, SIH ENT Dr. Mann and Absher reviewed the CT scans and referred Nichols to Dr. Schneider at Washington University in St. Louis because his surgical subspecialty focused on the sinus and naval cavities. (Doc. 139-4, pp. 21-23). Nichols would need approval from Wexford to see Dr. Schneier (Doc. 141-2, pp. 135, 166).

On January 7, 2021, Nichols wrote a sick call request to see a doctor because swollen polyps in his nose were causing him to choke. (Doc. 141-3, pp. 103-104). On January 10, 2021, Nichols complained to RN Lee Grayson of sinus drainage from the swollen polyps were causing him to choke. *Id.*; Doc. 140-6, p. 571. Nichols was referred to the MD call-line on January 10, 2021, by Grayson, but he did not see a provider because Menard was on a lockdown and the appointment with a physician was never rescheduled. (Doc. 141-3, pp. 104-105). Nichols continued having trouble breathing with nasal polyps visibly protruding from his nose, constant coughing, and inability to speak in complete sentences (Doc. 141-8, at ¶ 3-7).

On January 25, 2021, at 2:30 a.m., Nichols was taken to the HCU with shortness of breath and symptoms of an upper respiratory infection. Nichols said he could not breathe and was choking on mucus in his throat that he could not cough up (Doc. 141-4, pp. 40-47; Doc. 140-6, pp. 574-577). RN Rable noted that Nichols was wheezing, had abnormal lung sounds and overused his Xopenex inhaler, known as the "rescue inhaler," which is a sign of out-of-control asthma. Nichols peak flows were measured at 150 (Doc. 141-4, p. 46). Rable believed she had an "urgent consultation" with Dr. Siddiqui and did not admit Nichols to the infirmary. *Id.* Rable documented Nichols had symptoms of an upper respiratory infection (URI), filled out the URI and shortness of breath (SOB) protocol sheets, and noted that Nichols was coughing and wheezing and had abnormal lung sounds (Doc. 126-5, pp. 574-577; Doc. 141-4, pp. 46-49). Nichols told Rable that he could not breathe and was choking on mucus in his throat that he could not cough up. *Id.*; Doc. 126-5, pp. 574-577. Rable gave Nichols a cold pill and nebulizer treatment and he was returned to his cell at 3:00 a.m. (Doc. 141-4, p. 50; Doc. 140-6, pp. 574-577).

On January 26, 2021, Dearmond saw Nichols in the HCU in response to Rable's request for an "urgent consultation" (Doc. 141-4, pp. 112-113; Doc. 140-6, p. 578). On January 26, 2021,

Dearmond noted that Nichols had been choking all night, was unable to sleep, used his inhaler more, and was unable to breathe well through his nose due to his nasal polyps. *Id*. Dearmond observed that Nichols had large nasal polyps and was unable to visualize past the polyp in the left nostril. *Id*. She gave Nichols another 125 IM shot of Solumedrol, a corticosteroid injection, and prescribed another 20-day prescription of Prednisone (20 mg twice a day for ten days, then 10 mg twice a day for ten days). *Id*.; Doc. 141-3, pp. 114-115; Doc. 141-2, p. 153; Doc. 141-6, p. 775. When Nichols was returned to his cell on January 26, 2021, he continued to cough and struggle to breathe and choke on mucus that he could not cough up (Doc. 141-8, ¶ 12).

On January 28, 2021, Nichols was coughing excessively throughout the day and his cellmate, Melvin Jones, and Darnell Polk, who was in the cell next to Nichols, yelled for a "Med Tech" (Doc. 141-8, ¶¶ 13, 14). Rable received a call to come to Nichols' cell because he was having trouble breathing. (Doc. 141-4, pp. 52-53). Rable instructed correctional officers to get a "stair chair" to transport Nichols to the HCU. *Id*. at p. 54. Nichols stopped breathing while being transported from his cell on the eighth floor to the HCU handcuffed in the "stair chair." *Id*. at p. 59. He was taken to the HCU where life saving measures were unsuccessful and was pronounced dead at 8:41 p.m. on January 28, 2021. *Id*. at pp. 60, 66.

Dr. Gershom Norfleet performed a postmortem examination on January 29, 2021, and determined Nichols' cause of death was bronchial asthma exacerbation. (Doc. 141-9, p. 548; Doc. 126-2, pp. 20-21, p. 30). Nichols' autopsy showed that his lungs were abnormally swollen with fluid and congested with blood. *Id*. The air passages were lined with "tenacious yellow mucus plugs" that clogged up the airways. Nichols' stomach was distended with air and contained approximately 75 ml of partially digested gastric contents mixed with mucus. The microscopic examination of Nichols' lung cells showed: congestion of the pulmonary vascular, meaning the

blood vessels in the tissue sample were congested; an unusually high amount of "eosinophils," a type of white blood cells that were within the mucus located within in the bronchial and bronchiolar lumens or smaller airways of the lungs, and submucosa, the cell layer beneath the larger airway; and thickening of the bronchial basement membrane, which is beneath the lining of the lung cavity. *Id.* at pp. 39-44.

## Discussion

Summary judgment is proper only if the moving party can demonstrate that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The moving party is entitled to summary judgment where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323. If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986). Any doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Lawrence v. Kenosha County,* 391 F.3d 837, 841 (7th Cir. 2004). Cross-motions for summary judgment do not automatically mean that all questions of material fact have been resolved. *Franklin v. City of Evanston,* 384 F.3d 838, 842 (7th Cir. 2004). The Court must evaluate each motion independently, making all reasonable inferences in favor of the nonmoving party with respect to each motion. *Id.* at 483.

The Eighth Amendment prohibits "cruel and unusual punishment" of a prisoner. A prison official's "deliberate indifference" to a prisoner's "serious medical needs" violates that mandate. *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015). To support a claim of deliberate indifference, a plaintiff must offer evidence that (1) he had an objectively serious medical condition, and (2) the

defendant acted with deliberate indifference to that condition. *See Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc).

A medical professional who has treated a prisoner "is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019), quoting *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008) (internal quotation omitted). In other words, to violate the Eighth Amendment, a treatment decision must be "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Sain*, 512 F.3d at 895, quoting *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998). The "receipt of *some* medical care does not automatically defeat a claim of deliberate indifference if a fact finder could infer the treatment was so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate a medical condition." *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007), quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996); *see also Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) ("a prisoner [does not] need to show that he was literally ignored").

**Defendants' Motion for Summary Judgment (Doc. 125)**

*Count I – Deliberate Indifference*

Defendants move for summary judgment, arguing Nichols did not have a serious medical need. While Defendants do not dispute that asthma *could* constitute a serious medical need, they assert Plaintiff cannot establish that prior to January 28, 2021, the day he died, Nichols had a serious medical need related to his asthma. The Court disagrees.

"As a general matter, asthma can be, and frequently is, a serious medical condition, depending on the severity of the attacks." *Lee v. Young*, 533 F.3d 505, 510 (7th Cir. 2008); *see*

*also Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) (observing that asthma, "depending upon its degree, can be a serious medical condition"). Here, there is evidence in the record that Nichols suffered from an objectively serious and well-documented medical condition as his obstructive nasal polyps aggravated his asthmatic condition and made it difficult for him to breathe. By January 2021, Nichols had gone through repeated rescue inhalers and complained to Wexford providers that he was choking on mucus and having difficulty breathing due to the swollen nasal polyps that were visibly protruding from his nose.

Defendants next contend that Dr. Siddiqui, Dr. Ritz, and NP Dearmond were not deliberately indifferent to his asthma or nasal polyps because Nichols was seen in the asthma clinic and provided inhalers and oral steroids to treat his nasal polyps. It is undisputed that Dr. Ritz was not Nichols' treating physician and there were no referrals to Dr. Ritz related to Nichols' asthma management. Dr. Ritz was not involved in Nichols' medication decisions, including ordering Prednisone. The extent of Dr. Ritz's involvement with Nichol's medical care were the approval of the CT scan in September 2020 and approval of a follow-up ENT appointment in December 2020. The Court finds this record insufficient to establish an Eighth Amendment claim against Dr. Ritz. Accordingly, Dr. Ritz is entitled to judgment as a matter of law.

As for Dr. Siddique and NP Dearmond, a reasonable jury could find that their actions constituted deliberate indifference. An inmate can establish deliberate indifference by showing that medical personnel persisted with a course of treatment they knew to be ineffective. *See Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020); *Greeno v. Daley*, 414 F.3d 645, 654-55 (7th Cir. 2005). There is evidence in this case that despite knowing that Nichols had been treated multiple times with Prednisone to no relief, he was repeatedly prescribed Prednisone on a daily basis under the direction of Dr. Siddiqui: two months in a row in March and April of 2020; two

weeks in June 2020; 20 days in July 2020; 20 days in August 2020; 30 days in September 2020; two weeks in November 2020; 20 days in December 2020; and on January 26, 2021, two days before he died. Nichols was clearly taking Prednisone more than "two to three times a month," which Dr. Siddiqui and Defendants' own expert consider "chronically excessive." By December 2020, Nichols began choking due to the excess mucus caused by his visible polyps. The polyps also caused Nichols to have trouble breathing. Dearmond noted on January 26, 2021 that Nichols had been choking all night, was unable to sleep and was unable to breathe well through his nose due to his nasal polyps. Dearmond treated him with oral steroids, including Prednisone, instead of admitting him to the HCU. Nichols died two days later. Based on the record, a reasonable jury could find that these defendants' overuse of Prednisone and failure to admit Nichols to the HCU in January 2021 amounted to deliberate indifference.

A reasonable jury could also conclude that the delay in Nichols' priority ENT referral constituted deliberate indifference. It is well established that an inexplicable delay in responding to an inmate's serious medical condition can reflect deliberate indifference. *See Goodloe*, 947 F.3d at 1031. This is particularly true if the delay exacerbates an inmate's medical condition or unnecessarily prolongs suffering. *Id.; see also Williams v. Liefer*, 491 F.3d 710, 715–16 (7th Cir. 2007). Defendants maintain that the COVID-19 restrictions prevented Nichols from being seen by ENT sooner. However, Menard was only on a mandated Covid-19 lockdown from March to June of 2020. Accordingly, Defendants Siddique and Dearmond are not entitled to judgment as a matter of law on Count I of the First Amended Complaint.

### *Counts II and III – Wrongful Death and Survival Act*

Plaintiff asserts a wrongful death action (Count II) and a survival action sounding in negligence (Count III). The Illinois Wrongful Death Act, 740 ILCS 180/1, provides an independent cause of action for damages arising from a decedent's death caused by wrongful act, neglect or default. *Kessinger v. Grefco, Inc.,* 623 N.E.2d 946, 948 (1993) (citations omitted). The Act's purpose is to compensate a surviving spouse and next of kin for the pecuniary losses sustained as a result of the decedent's death. *Id.* "Aside from the additional element of the occurrence of death, the elements of a wrongful death claim are identical to those of a common law negligence claim." *Williams v. Manchester,* 864 N.E.2d 963, 974 (2007). A claim under the Act requires proof that: "(1) defendant owed a duty to decedent; (2) defendant breached that duty; (3) the breach of duty proximately caused decedent's death; and pecuniary damages arising therefrom to persons designated under the Act." *Thompson v. City of Chicago,* 472 F.3d 444, 457 (7th Cir. 2006) (quoting *Leavitt v. Farwell Tower Ltd. Partnership,* 625 N.E.2d 48, 52 (Ill. App. 1st Dist. 1993)). The Illinois survival statute does not create a statutory cause of action, but instead allows a representative of the decedent to maintain those statutory or common law actions which had already accrued to the decedent before he died. *Myers v. Heritage Enters., Inc.,* 773 N.E.2d 767, 769 (2002).

As an initial matter, Defendants argue that Plaintiff failed to produce an affidavit as required by 735 ILCS 5/2-622. Illinois law requires plaintiffs seeking medical malpractice damages to attach written reports from health care professionals to their complaints. *Hahn v. Walsh*, 762 F.3d 617, 633 (7th Cir. 2014). A plaintiff in federal court must procure the requisite documentation, not during the pleading stage, but before the completion of the summary judgment phase of the case. *See Young v. United States*, 942 F.3d 349, 351 (7th Cir. 2019) ("Section 5/2-

622 applies in federal court to the extent that it is a rule of *substance*; but to the extent that it is a rule of *procedure* it gives way to Rule 8 and other doctrines that determine how litigation proceeds in a federal tribunal.") (emphasis in original).

Generally, "Illinois courts liberally construe certificates of merit in favor of the plaintiff, recognizing the statute as a tool to reduce frivolous lawsuits by requiring a minimum amount of merit, not a likelihood of success." *Sherrod v. Lingle*, 223 F.3d 605, 613 (7th Cir. 2000). A Section 5/2-622 report meets the statute's requirements if it is "sufficiently broad to cover each defendant, adequately discusses deficiencies in the medical care given by defendants, and establishes that a reasonable and meritorious cause exists for filing the action." *Id.* (citation omitted).

Dr. Herrington's Report details the applicable standard of care, the manner in which the standard was breached, and a causal connection between the breach and injury sustained. The Report adequately discusses the deficiencies in the medical care provided by the defendants and establishes that a cause of action exists under the circumstances. The "technical requirements of this statute should not interfere with the spirit or purpose of the statute [because] the absence of strict technical compliance is one of form only and not of substance. The technical requirements of the statute should not be mechanically applied to deprive the plaintiff of her substantive rights." *Comfort v. Wheaton Family Practice*, 594 N.E.2d 381, 384 (2d Dist. 1992). The Court finds that Dr. Harrington's report satisfies the purpose of the statute.

Turning to the merits of Plaintiff's wrongful death and survivor claims, Defendants contend that they are entitled to judgment as a matter of law because they timely responded to Nichols' complaints and ordered approved treatment aimed at reducing his symptoms while he was being assessed by specialty care. Whether Defendants breached their duty owed to Nichols is clearly in

dispute. Plaintiff's expert opines that they did, while Defendants deny any such breach. And whether a breach of Defendants' duties proximately caused Nichols' injuries is a question of fact that must be decided by the jury. *See Shick v. Ill. Dep't of Human Servs.,* 307 F.3d 605, 615 (7th Cir. 2002) (Whether or not the defendant's conduct proximately caused the plaintiff's injury ordinarily is a question for the finder of fact to decide; only rarely are the facts so clear that the court can resolve the issue as a matter of law). Accordingly, Defendants' motion for judgment as to Counts II and III is denied.

### Plaintiff's Partial Motion for Summary Judgment (Doc. 130)

Plaintiff moves for partial summary judgment on her survival claim, asserting it is undisputed that: (1) Nichols continued to experience pain and suffering from the obstructive nasal polyps as Wexford healthcare providers at Menard repeatedly treated his condition with a steroid medication they knew were ineffective; and (2) Nichols suffered as a result of the delays to get him to a surgical specialist to remove the polyps prior to his death.

Again, whether Defendants were deliberately indifferent and/or breached their duty to Nichols are factual disputes for the jury to decide. Accordingly, Plaintiff's motion for summary judgment is denied.

### Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 125) is **GRANTED in part** and **DENIED in part**. Plaintiff's Partial Motion for Summary Judgment (Doc. 130) is **DENIED**. Plaintiff's claims against Defendants Mohammed Siddiqui and Ali Dearmond (Counts I) and against Defendant Wexford Health Sources, Inc. (Counts II and III) will proceed to trial. Plaintiff's claims against Defendant Stephen Ritz (Count I) and Plaintiff's *Monell* claim against Defendant Wexford Health Sources, Inc. (Count IV) are **DISMISSED with**

**prejudice**.  The Clerk of Court is **DIRECTED** to enter judgment accordingly at the close of the case.

     **IT IS SO ORDERED.**

     **DATED: December 3, 2025**

                                               **STACI M. YANDLE**
                                               **United States District Judge**